968 P.2d 1081

**Kenam KIM, Petitioner–Appellant,**

v.

**EMPLOYEES' RETIREMENT SYSTEM, State of Hawai'i, Respondent-Appellee.**

**No. 20957.**

Intermediate Court of Appeals of Hawai'i.

Nov. 24, 1998.

Lowell K.Y. Chun–Hoon (King, Nakamura & Chun–Hoon, of counsel), Honolulu, for petitioner-appellant.

Russell A. Suzuki (with him on the brief, Diane Erickson and Katherine C. Desmarais), Deputy Attorneys General, for respondent-appellee.

BURNS, C.J., ACOBA, and KIRIMITSU, JJ.

Opinion of the Court by BURNS, C.J.

Petitioner–Appellant Kenam Kim (Kim) appeals the circuit court's September 29, 1997 Judgment affirming the December 9, 1996 Declaratory Order (Declaratory Order) issued by Respondent–Appellee Board of Trustees, Employees' Retirement System, State of Hawai'i (ERS), denying Kim's application for a recalculation and increase of his retirement benefits. We vacate and remand with instructions to reverse in part and affirm in part.

This opinion deals with the interpretation/application of the requirement in Hawai'i

Revised Statutes (HRS) § 88–98 (1993) that the retirement allowance of a retirement system member who retired and subsequently returned to State employment for three or more years and then retired again shall be "computed as if the retirant were retiring for the first time[.]"

## BACKGROUND

Kim's history as an ERS member is as follows:

On May 16, 1985, Kim retired with 20 years, 9 months of credited service plus 9 months of unused sick leave credits. Choosing among the retirement allowance options offered by HRS § 88–83 (1993), Kim selected Option 5 and received a lump sum payment of $59,482.10 for his accumulated contributions and a monthly pension of $979.44 per month.

Kim's monthly payments ceased after December 30, 1990 because Kim commenced employment at the Department of Public Safety on January 2, 1991. By this time, Kim had received a total of $129,282.10 in benefits (the $59,482.10 lump sum payment plus monthly retirement benefits totalling $69,800).

On February 16, 1994, Kim retired, selected Option 5, and received a lump sum payment of $33,323.67 for his accumulated contributions. His monthly retirement benefit was increased to $1,709.90 per month, an increase of $730.46 per month or $8,765.52 per year.

Kim was credited with the following years of service:

| | | |
|---|---|---|
| First employment | 20 years | 9 months |
| Second employment | 3 years | 1 month |
| Purchased military service | 1 year | 5 months |
| Unused sick leave (from both periods of employment) | 1 year | |
| TOTAL | 26 years | 3 months[1] |

HRS § 88–83 states in relevant part as follows:

---

1. These figures were taken from Exhibit 2 of Respondent–Appellee Employees' Retirement System, State of Hawai'i's (ERS) Memorandum in Opposition to Petition for Declaratory Ruling. In his Opening Brief, Petitioner–Appellant Kenam Kim (Kim) states that he was credited with 20 years and 10 months for the first employment and 3 years and 0 months for the second employ-

ment. Kim's figures were taken from an April 6, 1995 letter to him from the ERS which is included in the record on appeal. The ERS and Kim both calculated the total amount of credited service to be 26 years and 3 months. The record on appeal does not provide an explanation for this inconsistency.

**Election of mode of retirement allowance.** (a) Maximum allowance: Upon retirement, any member may elect to receive the maximum retirement allowance to which the member is entitled....

In lieu of this maximum allowance, the member may elect to receive the member's retirement allowance under any one of the optional plans described below, which shall be actuarially equivalent to the maximum allowance.

\* \* \*

Option 5: The member may elect to receive the balance of the member's accumulated contributions at the time of retirement in a lump sum and, during the member's lifetime a retirement allowance equal to the maximum retirement allowance reduced by the actuarial equivalent of these contributions....

HRS § 88–21 (1993) defines "retirement allowance" as "the benefit payable for life as originally computed and paid a member at the point of the member's retirement in accordance with the mode of retirement selected by the member, exclusive of any bonus or bonuses." HRS § 88–74(1) (1993) more specifically defines "retirement allowance" as "two per cent of the member's average final compensation multiplied by the total number of years of the member's credited service[.]"

HRS § 88–21 defines "average final compensation" as "the average annual compensation as described in section 88–81, which becomes part of the formula for the computation of a retirement allowance." HRS § 88–81(2) (1993) more specifically defines "average final compensation" as follows:

(2) for employees who become members on or after January 1, 1971, the average annual compensation pay or salary upon which a member has made contributions as required by sections 88–45 and 88–46, (A) during his three highest paid years of credited service; provided that no payment of salary in lieu of vacation shall be included in the computation, or (B) if he has less than three years of credited service, then during his actual years of credited service.

Prior to the enactment of HRS § 88–98 in 1974, when a member was employed twice and retired twice, the retirement allowances for the two retirements were calculated separately and independently from each other. Each had its own "total number of years of the member's credited service" and each had its own "average annual compensation pay or salary ... during [the member's] three highest paid years of credited service[.]"

HRS § 88–98 [2] states in relevant part as follows:

§ 88–98  **Return to service of a retirant.**  Any retirant who returns to employ-

tirement initially selected and computed for the member's age, average final compensation, and other factors in accordance with the benefit formula in existence at the time of the member's latest retirement; or

(B) For members with three or more years of credited service during the member's period of reemployment, the allowance computed as if the member were retiring for the first time; provided that in no event shall the allowance be less than the amount determined in accordance with subparagraph (A); and

(2) If the retirant returns to service after June 30, 1998, and again retires, the retirant's retirement allowance shall be computed in accordance with paragraph (1)(A), regardless of the number of years of service in the reemployment period,

The board of trustees shall adopt such rules as may be required to administer the purposes of this section.

---

2.  Act 151, 1998 Haw. Sess. L. Act 151, § 10 at 544–45,, which took effect on July 7, 1998, amended HRS § 88–98 to read as follows:

§ 88–98  **Return to service of a retirant.** Any retirant who returns to employment requiring active membership shall be reenrolled as an active member of the system in the same class from which the retirant originally retired and the retirant's retirement allowance shall be suspended.

(1) If the retirant returns to service before July 1, 1998, and again retires, the retirant's retirement allowance shall consist of:

(A) For members with fewer than three years of credited service during the member's period of reemployment, the allowance to which the member was entitled under the mode of retirement selected when the member previously retired and which was suspended; plus, for the period of service during the member's reemployment, the allowance to which the member is entitled for that service based on the mode of re-

ment after June 30, 1984, requiring the retirant's active membership shall be reenrolled as an active member of the system in the same class from which the retirant originally retired and the retirant's retirement allowance shall thereupon be suspended. At such time as the retirant again retires, the retirant's retirement allowance shall consist of:

(1) If the retirant has less than three years of credited service during the retirant's period of reemployment, the allowance to which the retirant was entitled under the mode of retirement the retirant selected when the retirant previously retired and which was suspended; plus, for the retirant's period of service during the retirant's reemployment, the allowance to which the retirant is entitled for such service computed for the retirant's age, average final compensation, and other factors in accordance with the benefit formula in existence at the time of the retirant's final retirement.

(2) If the retirant has three or more years of credited service during the retirant's period of reemployment, the allowance computed as if the retirant were retiring for the first time provided that in no event shall such allowance be less than the amount determined in accordance with [paragraph] (1) hereof.

The board of trustees shall adopt such rules as may be required to administer the purposes of this section.[3]

(Footnote added.)

Thus, when computing a retirement allowance of "two per cent of the member's average final compensation multiplied by the total number of years of the member's credited service" pursuant to HRS § 88–74(1), HRS § 88–98 required (a) the computation of the member's "average final compensation" considering the member's compensation during the member's first and second employments, and (b) the combination of the member's total number of years during the two periods of service.

In Kim's case, the Declaratory Order states in relevant part as follows:

The Petition seeks a declaratory ruling that pursuant to [HRS] § 88–98, [Kim] is entitled to a retirement allowance of $1,840.00 per month. [Kim] does not contest the propriety of deducting the lump sum contributions of $59,482.10 he was refunded upon his first retirement since that would result in a double recovery. However, [Kim] asserts that the System had no authority to deduct the monthly pension benefits paid during his first retirement period of $66,159.59.[4]

(Footnote added.)

The statement in the Declaratory Order that "[Kim] does not contest the propriety of deducting the lump sum contributions of $59,482.10 he was refunded upon his first retirement since that would result in a double recovery" is wrong. As noted in Kim's opening brief to the circuit court, Kim's counsel "at the July 10, 1996, hearing before the Board of Trustees ... orally amended [Kim's] position to recover this $59,482.10."

HRS § 88–98 was enacted into law by Act 108, 1974 Haw. Sess. L. Act 108, § 1 at 196–97 the genesis of which was H.B. No. 2801–74. When the legislature was considering H.B. No. 2801–74, the ERS submitted to the legislature a letter dated March 18, 1974, stating as follows:

5. [Assistant Administrator] also is informed and believes that the language in § 88–98, HRS, regarding how to calculate benefits on a second retirement is clear and unambiguous.

---

**3.** The explanation by the Assistant Administrator for the ERS for the fact that the Board of Trustees did not adopt any relevant rules is as follows:

4. [Assistant Administrator] is informed and believes that rules were not promulgated because it was believed based on the experience of [the ERS] the frequency of retirants returning to service was few and the usual length of the returning retirants' reemployment term retirement was short, thus, there was not need to develop any rules.

**4.** In its April 6, 1995 letter to Kim, the ERS advised Kim that during his first retirement he received the following:

$ 66,128.00     (basic pension benefit)
  3,672.00     (post retirement benefits)
$ 69,800.00     (total)

COMMENTS ON H.B. NO. 2801

### RELATING TO PENSIONERS WHO RETURN TO EMPLOYMENT

The present statutes governing retirement benefits do not provide for pensioners who retire and return to service. Present administrative rules require that when these persons return to active service, their retirement benefit is suspended and when they retire again, the benefit of their first retirement is restored and the benefit accrued as a result of their second period of membership is added to it.

The purpose of H.B. No. 2801 is to fill the gap in the law to provide for the treatment of pensioners returning to service. The bill proposes to continue the present practice, as hereinabove described, except that if the member has at least three years of credited service during the period of his re-employment, his benefit shall be computed as if he had retired for the first time provided, however, that in no event shall the benefit computed in this manner be less than that which would have been obtained if computed under the present practice.

We have discussed the cost implication of this bill with our actuary and are advised that, in view of the small number of pensioners returning to active service, the cost effects would be negligible since the proposed amendment would not justify any changes in the actuarial assumptions or calculation procedures.

Letter from K.T. Lee, Secretary, ERS, State of Hawaiʻi, to Hawaiʻi State Legislature (March 18, 1974).

Hse. Stand. Comm. Rep. No. 286–74, in 1974 House Journal, at 665–66, on H.B. no. 2801–74 states in relevant part as follows:

The purpose of this bill is to amend present law relating to retirement benefits by providing for the treatment of pensioners who retire and return to service. At present, no provision is made for such pensioners.

This bill will fill in the gap in the law and proposes to continue the present practice under administrative rules with the exception that if a member has at least three (3) years of credited service during the period of his re-employment, his benefit shall be computed as if he had retired for the first time, provided, however, that the benefit computed in this manner shall not be less than that which would have been obtained if computed under present practice.

Sen. Stand. Comm. Rep. No. 937–74 in 1974 Senate Journal, at 1121, by the Senate Committee on Public Employment regarding H.B. No. 2801–74 states in relevant part as follows:

The purpose of this Bill is to fill a gap in the retirement system law by providing for the treatment of pensioners who return to active membership in the system. Presently, there is nothing in the law which prescribes for such treatment, particularly as to the computation of their retirement benefits when they again retire. Present administrative practice is to suspend their retirement benefit and when they retire again, the benefit of their first retirement is restored and the benefit which accrued from their second period of membership is added thereto.

This Bill proposes to add a new section in the retirement system law which will provide for the continuation of the present practice with one exception: that if the member has at least three years of credited service during the period of reemployment, his benefit shall be computed as if he had retired for the first time.

It is clear that the ERS's March 18, 1974 letter quoted above was the source of the two legislative committee reports quoted above.

In Kim's case, in its Memorandum in Opposition to Petition for Declaratory Ruling, the ERS stated in relevant part as follows:

Section 88–98(2), Hawaiʻi Revised Statutes ("HRS") requires [the ERS] to calculate [Kim's] retirement benefits at the time of his retirement on February 16, 1994, "as if [Kim] were retiring for the first time." To accomplish this, [the ERS] must take the following steps:

1. Combine the service credits from the two periods of employment;

2. Use the "High 3" or "High 5" [5] of average final compensation for the combined service;

3. Allow [Kim] to change the mode of retirement if desired;

4. Restore any unrefunded or unrecovered contributions from the earlier retirement to [Kim's] account; and

5. Obtain reimbursement of all benefits paid during the first retirement period or offset the maximum monthly allowance by the total benefits received divided by the annuity value at the time of the first retirement and divided again by 12 months[.]

(Footnote added.)

In applying the foregoing formula, the ERS initially computed that Kim's maximum allowance prior to any deduction is $3,033.90 per month. It then reduced that amount by the following amounts: (A) $332.89, which it says is the actuarial equivalent of the $33,-323.67 refund of contributions that Kim received in accordance with Option 5 upon his second retirement; and (B) $991.12, which it says is the actuarial equivalent of the benefits received by Kim during his first retirement calculated as follows: $59,482.10 plus the $69,800 equals $129,282.10 divided by 10.87 (the annuity value at the time of Kim's first retirement) [6] divided by 12 months. The ERS then awarded Kim the resulting amount of $1,709.90 per month.

**5.** HRS § 88–81(1) (1993) allows the use of the average annual compensation during the five highest paid years of credited service for employees who have become members prior to January 1, 1971 and the use of the average annual compensation during the three highest paid years of credited service for employees who have become members on or after January 1, 1971.

**6.** The reduction for the $59,482.10 was $456.01 per month and the reduction for the $69,800 was $535.11 per month.

The fact that the ERS used the annuity value (10.87) at the time of Kim's first retirement suggests that its calculations were based on an assumption that Kim received all of those payments in one lump sum at the time of his first retirement on May 16, 1985. However, Kim received the $69,800 in monthly payments of $979.44 from May 16, 1985 through December 30, 1990. If the ERS was authorized to make a deduction for the $69,800, it would be authorized to charge Kim no more than the actuarial equivalent of the lump sum dollar amount it

## POSITIONS OF THE PARTIES

In his Reply Brief, Kim states that

What [Kim] contests is the reduction of his final monthly pension allowance upon his second retirement in 1994 by the actuarial value of (1) $69,800.00 he received in monthly pension from 1985–1994 during his first retirement, and (2) $59,482.10 paid upon his first retirement.

\* \* \*

[T]he judgment ... should be reversed and the court should find [sic] as a matter of law that HRS Section 88–98(2) entitles [Kim] to a monthly retirement allowance that is not reduced by the actuarial value of his refunded initial lump sum contribution to the retirement system [the $59,-482.10] or the monthly pension benefits he received during his first retirement [the $69,800].

In other words, Kim's position is that the statute requiring the ERS to compute Kim's second retirement allowance as if Kim were retiring for the first time does not authorize the ERS to deduct any amount in consideration of the monthly retirement payments or the lump sum payment paid by the ERS to Kim at or during his first retirement.[7]

The position of the ERS is that

would have reasonably cost the ERS at Kim's first retirement to purchase a payment plan that would have paid Kim the payments actually made to Kim commencing May 16, 1985 through December 30, 1990, and totalling $69,800.

**7.** In the Petition for Declaratory Ruling, Kim's counsel wrote in relevant part:

Had Petitioner actually retired for the first time in February of 1994, his allowance would not reflect any deduction for retirement benefits previously paid him. Thus, no monthly deduction based on his prior $66,159.59 in monthly payments from May 15, 1985 to December 30, 1990 should be made. To make such a deduction would be to compute his allowance as though he is retiring for a *second time*, in contravention of the plain language of Section 88–98(2) HRS.

In his opening brief to the circuit court, Kim's counsel wrote in relevant part as follows:

When any member of the State Employees Retirement System retires for the first time, there is never any reduction for previously

HRS § 88–98 requires that [Kim's] benefits be calculated as if his second retirement were his first retirement; the only way this could occur is if [Kim] returned all benefits received by him during his first retirement.

Kim responds that:

HRS [§ ] 88–98 does not require [Kim] to reimburse all benefits paid to him during his first retirement when he retires a second time. There is no authority for such a deduction and the deduction contravenes the statutory purpose of encouraging retirees with unique skills to return to public service for an extended period of time.

## DISCUSSION

### 1.

Kim argues that

[t]hough [HRS § 88–98] as a whole meaningfully fills a gap in existing law by providing for pensioners who return to employment and then retire a second time, [HRS § 88–98(2) becomes superfluous unless it results in a change in the amount of the monthly allowance paid as calculated under [HRS § 88–98(1) ] and HRS § 88–81].

\* \* \*

The legislative enactment of [HRS § 88–98(2) ] can only be saved from insignificance and harmonized by reading the phrase "as if the retirant were retiring for the first time", to result in further enhancement of retirements [sic] benefits be-

yond what is already afforded by [HRS §§ 88–81 and 88–98(1) ]. Otherwise, there would be no need to utilize two distinguishing subparts of the statute with differing phraseology concerning computation of retirement allowance.

We disagree. The two sections are materially different. HRS § 88–98(1) continues the prior practice of separating the two periods of employment. HRS § 88–98(2) combines the two periods of employment.

Nevertheless, we also conclude that the interpretation implemented by the ERS in Kim's case and urged by it in this appeal violates the interpretation of HRS § 88–98 as stated by the ERS in its March 18, 1974 letter to the legislature commenting on H.B. No 2801–74.

■ We interpret [8] HRS § 88–98 in accordance with the March 18, 1974 letter from the ERS to the legislature. That letter first notes that

The present statutes governing retirement benefits do not provide for pensioners who retire and return to service. Present administrative rules require that when these persons return to active service, their retirement benefit is suspended and when they retire again, the benefit of their first retirement is restored and the benefit accrued as a result of their second period of membership is added to it.

This paragraph describes the prior practice and is consistent with HRS 88–98(1). This paragraph implicitly admits that when

---

paid retirement benefits, either by lump sum or monthly allowance.... If the words "as though retiring for the first time" are to be given their plain meaning, [Kim] should have his pension allowance assessed without the encumbrance of prior payments and transactions, since this prior record never exists when a member retires "for the first time".

8. As in all cases of statutory interpretation, we look first at the language of the statute. And in the absence of "a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."

\* \* \*

"But we have rejected an approach to statutory [interpretation] which limits us to the words of a statute, no matter how clear they

may appear upon perfunctory review." For we recognize "our primary duty [in interpreting statutes] is to ascertain the intention of the legislature and to implement that intention to the fullest degree,"; and where "there is ... material evidencing legislative purpose and intent, there is no reason for a court to seek refuge in 'strict construction,' 'plain meaning,' or 'the popular sense of the words.' "

We therefore turn to the history of [the statute] to ascertain whether the legislature might have had another meaning in mind when it adopted the language in question. But "we do so with the recognition that only [a clear] showing of contrary intentions from that data would justify a limitation on the 'plain meaning' of the statutory language."

*Kaiama v. Aguilar*, 67 Haw. 549, 553–54, 696 P.2d 839, 842 (1985) (citations omitted).

the benefit of the first retirement is restored upon the second retirement, the reduction previously made for the Option 5 lump sum withdrawal continues and there is no additional reduction for the total of the monthly payments received after the first retirement and before the second employment.

The March 18, 1974 letter from the ERS notes second that

[t]he purpose of H.B. No. 2801 is to fill the gap in the law to provide for the treatment of pensioners returning to service. The bill proposes to continue the present practice, as hereinabove described, except that if the member has at least three years of credited service during the period of his re-employment, his benefit shall be computed as if he had retired for the first time provided, however, that in no event shall the benefit be computed in this manner be less than that which would have been obtained if computed under the present practice.

This paragraph states that "[t]he bill proposes to continue the present practice, as hereinabove described[.]" In other words, it recognizes the continuation of the reduction for the Option 5 lump sum withdrawal at the first retirement and does not authorize an additional reduction for the total of the monthly payments received after the first retirement and before the second employment.

As stated in the Senate's Standing Committee Report No. 937–74,

a new section in the retirement system law . . . will provide for the continuation of the present practice with one exception: that if the member has at least three years of credited service during the period of reemployment, his benefit shall be computed as if he had retired for the first time.

■ Clearly, when computing "a retirement allowance of two per cent of the member's average final compensation multiplied by the total number of years of [the member's] credited service" pursuant to HRS § 88–74(1), only "one exception" from the prior practice is authorized. As previously noted, that exception is (a) the computation of the member's "average final compensa-

tion" considering the member's compensation during the member's first and second employments, and (b) the combination of the member's total number of years during the two periods of service.

Under the prior practice, the only deductions from Kim's maximum retirement allowance of $3,033.90 per month that were authorized are deductions of the actuarial equivalent of his accumulated contributions when he withdrew them ($59,482.10 at his first retirement and $33,323.67 at his second retirement). The one exception enacted in 1974 as HRS § 88–98(2) did not authorize a reduction for the $69,800 total of the monthly payments received by Kim during his first retirement before his second employment.

In summary, we conclude that the $332.89 reduction made for the $33,323.67 lump sum payment received by Kim at the time of his second retirement and the $456.01 per month reduction made for the $59,482.10 lump sum payment received by Kim at the time of his first retirement are authorized and proper; and the $535.11 per month reduction made for the monthly payments to Kim starting on May 16, 1985 and ending on December 30, 1990 and totalling $69,800 is unauthorized and improper.

### 2.

In support of his argument that no deduction should be made for the $69,800 total of monthly payments made to him, Kim presented to the ERS the February 25, 1996 affidavit of former Representative Kenneth Lee (Lee). Lee was the chair of the House Committee on Labor and Public Employment in 1974, and the legislator who introduced, under his signature alone, the original bill that became HRS § 88–98. Lee states that "[w]e did not intend that the retiree's pension should be offset or reduced by any periodic payments paid during the employee's first period of retirement." Lee did not comment with respect to lump sum payments paid at the time of the employee's first retirement.

Kim contends that

a statement of a legislative sponsor, such as Rep. Lee (ROA at 66), is "an authoritative guide to the statute's construction." *North Haven Board of Education v. Bell*, 456 U.S. 512, 527, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982).

\* \* \*

Though Rep. Lee's statements are made a number of years after the bill's passage rather than contemporaneously, ... they should be accorded persuasive weight.

■ For three reasons, we accord no weight to Lee's statement of the statute's purpose. First, Lee did not make his statement of the statute's intent in the legislative history. Second, the rule of *North Haven Board of Education v. Bell*, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), is less expansive than Kim represents. In that case, the United States Supreme Court stated in relevant part as follows:

Although the statements of one legislator made during debate may not be controlling, Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction. And, because §§ 901 and 902 originated as a floor amendment, no committee report discusses the provisions; Senator Bayh's statements—which were made on the same day the amendment was passed, and some of which were prepared rather than spontaneous remarks—are the only authoritative indications of congressional intent regarding the scope of §§ 901 and 902.

*Id.* at 526–57, 102 S.Ct. 1912 (citations omitted).

Third,

"[m]ore often than not, what passes for 'legislative intent' is no more than the ideas of a few individual legislators. Statements by legislators or even committee reports need not reflect the purpose which a majority of the legislators believed is carried out by [a] statute." *Yoshizaki v. Hilo Hospital*, 50 Haw. 150, 153 n. 5, 433 P.2d 220, 223 n. 5 (1967).

*Dines v. Pacific Ins. Co., Ltd.*, 78 Hawai'i 325, 332, 893 P.2d 176, 183 (1995).

We conclude that a former legislator's statement in 1996 of the intent of the legislative committee he chaired in 1974 with respect to a bill which he introduced that ultimately became an act in 1974 is not valid evidence of legislative intent in 1974 with respect to that act.

## CONCLUSION

Accordingly, we vacate the circuit court's September 29, 1997 Judgment affirming the December 9, 1996 Declaratory Order issued by the ERS. We remand to the circuit court for entry of a judgment (a) reversing that part of the December 9, 1996 Declaratory Order issued by the ERS that deducts from Kim's maximum allowance the amount of $535.11 per month for the $69,800 total of the monthly payments received by appellant Kenam Kim during his first retirement, and (b) affirming all other parts of the December 9, 1996 Declaratory Order.